# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| FUSE CHICKEN, LLC, | ) Case No. 5:17-cv-01538-SL |
| | ) |
| Plaintiff, | ) Hon. Sara Lioi |
| v. | ) Hon. Kathleen B. Burke |
| | ) |
| AMAZON.COM, INC. | ) **AMAZON.COM, INC.'S MOTION TO** |
| and DOES 1–10, | ) **EXCLUDE CERTAIN OPINIONS OF** |
| | ) **PLAINTIFF'S EXPERT DAVID HAAS** |
| Defendant(s). | ) **AND MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT THEREOF** |

Pursuant to Federal Rule of Evidence 702 and Local Civil Rule 7.1, Amazon.com, Inc. moves to exclude Fuse Chicken, LLC's expert David Haas's calculations of (1) Fuse Chicken's alleged lost sales using the Bass Model; and (2) Fuse Chicken's alleged lost profits, which rely on the Bass Model lost sales calculations, as reflected in paragraphs 21, 68-69, 73-89, 98-99, and 104, and exhibits 3-7, of Mr. Haas's report ("Motion").  In addition, should the Court grant Amazon's motion to exclude Dr. Ghose's opinion regarding international reliance on Amazon.com reviews, Dkt. 124, the Court should strike paragraphs 63-66 and 106 of Mr. Haas's report, which rely on and assume Dr. Ghose's opinion as true.

This Motion is based on the Memorandum of Points and Authorities, the supporting declaration and exhibits, all pleadings and papers on file in this action, and any other information and argument that the parties may present.

| | |
|---|---|
| DATED: February 21, 2019 | */s/ Clara J. Shin* |
| | Clara J. Shin (admitted *pro hac vice*) |
| | Nathan E. Shafroth (admitted *pro hac vice*) |
| | Lindsey Barnhart (admitted *pro hac vice*) |
| | David S. Watnick (admitted *pro hac vice*) |
| | COVINGTON & BURLING, LLP |
| | |
| | Roger M. Synenberg (#32517) |
| | Clare C. Moran (#81134) |
| | SYNENBERG, COLETTA & MORAN, LLC |
| | |
| | *Attorneys for Defendant Amazon.com, Inc.* |

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.  INTRODUCTION ................................................................................................................. 1

II.  LEGAL STANDARD ............................................................................................................ 4

III.  ARGUMENT ......................................................................................................................... 4

    A.  The Bass Model Is Not a Reliable Methodology for Calculating Lost Sales. ................................................................................................................. 4

    B.  Mr. Haas Is Not Qualified to Offer an Expert Opinion Regarding the Application of the Bass Model to Calculate Lost Sales. ....................................... 7

        1.  Mr. Haas had no knowledge of the Bass Model prior to August 2018. ............................................................................................................. 7

        2.  Mr. Haas has no specialized knowledge regarding the construction or implementation of the Bass Model. ........................................................ 8

        3.  Mr. Haas has no specialized knowledge regarding the determination of any of the input variables used in the Bass Model. .......... 9

    C.  Mr. Haas's Application of the Bass Model Relies Entirely on Self-Serving and Untested Assumptions Provided by Fuse Chicken Management. ................. 11

    D.  Mr. Haas's Damages Opinion Relies on and Falls with Dr. Ghose's Causation Opinion. ............................................................................................. 14

IV.  CONCLUSION .................................................................................................................... 15

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION**

In this litigation, Fuse Chicken—a company that sells phone and tablet charging cables—claims that the alleged sale of non-Fuse Chicken products on Amazon.com led customers to post negative reviews of Fuse Chicken products, which purportedly caused Fuse Chicken to lose sales starting in November 2016.  Fuse Chicken's calculation of the sales (and concomitant profits) it allegedly lost has grown by leaps and bounds during the life of this case: in July 2017, Fuse Chicken estimated that it had "lost between $50,000 and $100,000 in sales"; in November 2017, it calculated ▮▮▮▮▮ in actual damages; and in April 2018, it projected ▮▮▮▮▮ in lost profits.  Now, Fuse Chicken demands ▮▮▮▮▮ in profits it allegedly lost or will lose during the three-and-a-half-year period between November 2016 and May 2020—▮▮▮▮▮ ▮▮▮▮▮ it collected during the five years prior to November 2016.

This meteoric rise in Fuse Chicken's claimed damages is fueled not by any new information learned during discovery or change in factual circumstances, but instead by Fuse Chicken's retention of a damages expert, David Haas, who employed a heretofore unheard of methodology for calculating lost sales, called the Bass Model.  The Bass Model, described by the equation, $Q_t = [p + q(A/M)] * (M - A)$, is *not* and has never been a model for calculating lost sales or litigation damages.  Rather, it is a marketing model, developed by marketing professor Frank Bass in the 1960s to predict and describe the rate of adoption of new product categories by a consumer population.  For example, someone in the 1960s could have used the Bass Model to predict the number of United States households who would own color televisions at any given time ($Q_t$), by considering: ▮▮▮▮▮

▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮

███████████████████████████████████████████████

██████████████████████████ Dkt. 97 (Haas Exp. Rpt.) ¶ 75.

Neither Mr. Haas nor Amazon is aware of the Bass Model *ever* being used for the completely different purpose for which Mr. Haas purports to use it here: to project what a single company's future sales of all of its various products, in the aggregate, would have been, absent alleged infringement. Indeed, even though Mr. Haas has performed damages calculations in hundreds of cases over the course of his 25-year career, he had never before used the Bass Model for *any* purpose, let alone to calculate lost sales. In fact, Mr. Haas had not even *heard of* the Bass Model until August 2018, and to implement it in this case, Mr. Haas relied entirely on the advice of an associate marketing professor, a software program he does not understand, and untested assumptions provided by Fuse Chicken management.

Amazon moves at this time to exclude Mr. Haas's unqualified, unsupported, and unreliable opinions regarding his calculations of (1) Fuse Chicken's alleged lost sales using the Bass Model; and (2) Fuse Chicken's alleged lost profits, which rely on the Bass Model lost sales calculations, as reflected in paragraphs 21, 68-69, 73-89, 98-99, and 104, and exhibits 3-7, of Mr. Haas's report.

*First*, the Bass Model is not a reliable method for determining lost sales. There is no evidence that the Bass Model has ever before been applied for this purpose, and so cannot be a "generally accept[ed]" methodology for the calculation of lost sales. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 584-85 (1993). The fact that Mr. Haas applied the Bass Model to calculate lost sales and profits solely for purposes of this litigation further confirms the unreliability of his methods. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation, because expert witnesses are not necessarily always unbiased scientists." (citation omitted)). Additionally, there is a fundamental disconnect between the theoretical underpinnings of the Bass Model—which was developed to model the *rate of adoption* of a new technology by

2

consumers, *across all brands* selling that technology—and Mr. Haas's specific application of the model in this case to calculate *lost sales* across all of the products within a *single brand*.

*Second*, Mr. Haas does not possess the required "specialized knowledge" of the Bass Model—a methodology he had not even *heard of* until two months before Fuse Chicken's deadline to submit expert reports. Fed. R. Evid. 702(a). Not once during his 25 years of experience as a litigation damages consultant did Mr. Haas use, read about, or analyze the methodology he employed to determine Fuse Chicken's lost sales in this case. His lack of expertise regarding the central methodology used to form his conclusions is confirmed by Mr. Haas's admitted reliance on *others* to construct and implement the Bass Model here. In short, Mr. Haas's Bass Model opinions do not rely "on his own skills, education, or experience," and so should be excluded. *Huffman v. Electrolux Home Prods., Inc.*, 129 F. Supp. 3d 529, 540 (N.D. Ohio 2015).

*Third*, Mr. Haas's unqualified Bass Model opinions are not supported by reliable facts. In arriving at his Bass Model opinions, Mr. Haas blindly adopted untested, unsupported, and litigation-driven sales estimates provided by Fuse Chicken's CEO and head of sales. To make matters worse, these sales estimates—prepared in connection with this litigation—*contradict* contemporaneous sales projections developed by Fuse Chicken's Chief Financial Officer in late 2016, right before the onset of the alleged damages period. Mr. Haas's "blind adherence" to Fuse Chicken management's litigation-driven projections "absent any sort of independent investigation stops short of the type of reliability contemplated by *Daubert*[.]" *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015).

*Finally*, Mr. Haas's damages calculations necessarily assume that Fuse Chicken lost sales in *international* marketplaces due to negative reviews on Amazon.com, the *United States* marketplace. But the only basis for that assumption is the unreliable opinion of Fuse Chicken's expert Anindya Ghose. *See* Dkt. 99. Should the Court grant Amazon's motion to exclude Dr. Ghose's unreliable opinions, Dkt. 125, Mr. Haas's calculations of Fuse Chicken's purported lost

sales and profits—which are *worldwide* calculations that encompass sales and profits purportedly lost in *all* geographic regions—must also necessarily be excluded.

## II. LEGAL STANDARD

Courts act as "gatekeepers" to ensure that all expert opinions admitted are "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This "'gatekeeper' doctrine was designed to protect juries" given the higher probative weight typically assigned to experts. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).

Consistent with this underlying purpose, a party may present expert opinion testimony only if (1) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based upon sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. When assessing the first factor, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) (citation omitted)). Courts assess the reliability of the expert's implementation of his chosen methodology by determining "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 600.

It is Fuse Chicken's "burden to establish by a preponderance of evidence" that Mr. Haas's qualifications and opinions satisfy these required criteria. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417, at *4 (N.D. Ohio July 1, 2010).

## III. ARGUMENT

### A. The Bass Model Is Not a Reliable Methodology for Calculating Lost Sales.

Mr. Haas's use of the Bass Model must be excluded because the model lacks "general acceptance" in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94. Even though

4

the Bass Model was first developed in the 1960s, and even though Mr. Haas has performed damages calculations in "at least a couple hundred" cases over the course of his 25-year career, Declaration of Lindsey Barnhart in Support of Amazon.com, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas ("Barnhart Decl.") Ex. A (Haas Dep. Tr.) 31:22-32:5, prior to this case Mr. Haas had never before heard of or used the Bass Model for *any* purpose, let alone to calculate lost sales.  In fact, **prior to August 2018 Mr. Haas had never even heard of the Bass Model**.  *Id.* 32:15-22 ("I had not heard of the specific Bass Model prior to August of 2018.").

Mr. Haas's lack of knowledge of the Bass Model is not surprising.  Mr. Haas is a damages expert, and the Bass Model is *not* a model for calculating lost sales or litigation damages.  It is a 1960s-era marketing model, *id.* 39:6-8, for predicting the rate of adoption of new product categories by consumer populations.  Dr. Bass—the model's namesake—specifically cautioned that "[t]he Bass Model is formulated to describe the diffusion of *category* demand" (*e.g.*, the adoption of color televisions), *id.* 117:7-119:5 (emphasis added); *see also* Barnhart Decl. Ex. B (F. Bass Article) at 1838, not *brand-level* diffusion (*e.g.*, the adoption of RCA color televisions).[1]  And, so far as Amazon can tell, the Bass Model has *never* been used for the completely different purpose for which Mr. Haas purports to use it here: to project a single company's future sales of all of its various products, in the aggregate (*e.g.*, the adoption of *any and all* products sold by RCA).

Fuse Chicken cannot carry its burden to show that the Bass Model has "general acceptance" in the "relevant scientific community"; Amazon was unable to locate any record of anyone ever using the Bass Model to calculate lost sales until Mr. Haas purported to do so in this

---

[1] Though Dr. Bass noted that, with appropriate modifications, the model may be used to measure diffusion at a product brand level, Mr. Haas did not personally make any modifications to the Bass Model to account for his application of it, nor does Mr. Haas "know one way or the other if there were modifications that were built into" the DecisionPro software he used to implement the Bass Model in this case.  Barnhart Decl. Ex. A (Haas Dep. Tr.) 117:7-118:16.

case.  *Daubert*, 509 U.S. at 593-94.  A Westlaw and LexisNexis search of all federal cases for the phrase "Bass Model" returned just two results, neither having anything to do with the forecasting of lost sales or profits or even Mr. Haas's marketing model: one relates to personal jurisdiction over a manufacturer of guitars, and one relates to a legal doctrine developed in a case called *United States v. Bass* concerning the showing a criminal defendant must make to seek discovery on a selective prosecution claim.  Barnhart Decl. ¶ 2; *see United States v. Washington*, 869 F.3d 193, 213 (3d Cir. 2017) (discussing "the *Armstrong/Bass* **model** for claims of selective enforcement in stash house cases" (emphasis added)); *Moseley v. Fillmore Co., Ltd.*, 725 F. Supp. 2d 549, 556 n.2 (W.D.N.C. 2010) (quoting a Wikipedia article discussing a "**bass model**" of the guitars in question (emphasis added)).  For his part, Mr. Haas did not attempt to "make a specific inquiry or perform any research or analysis to determine if the Bass Model had been used to perform any actual damages calculations in the past."  Barnhart Decl. Ex. A (Haas Dep. Tr.) 37:4-12.  Unless the "relevant scientific community" is defined as a community of one— consisting of just Mr. Haas, and not until August 2018—it is undisputed that the Bass Model is not a "generally accept[ed]" theory or technique for the calculation of lost sales.  *Daubert*, 509 U.S. at 593-94.

      The Court in *Feduniak v. Old Republic National Title Co.* granted a motion to exclude an expert in similar circumstances.  In that case, the plaintiff offered expert testimony of an accomplished accountant and financial analyst who employed a methodology that had never before been used for the specific purpose at issue in the case: calculating diminution in value of real property.  *Feduniak*, 2015 WL 1969369, at *4 (N.D. Cal. May 1, 2015).  Because there was "no evidence before the Court" that use of the methodology "is generally accepted as an appropriate method" to perform such calculation "by professionals who regularly value real property," the Court granted the motion to exclude.  *Id.*  Similarly, here, there is no evidence that *any* valuation professional—including Mr. Haas himself—has ever before used the Bass Model to calculate lost sales, whether in connection with litigation or for any other purpose.

6

Mr. Haas's use of the Bass Model to calculate lost sales for apparently the first time in history, and solely for purposes of litigation, underscores the unreliability of his approach. The Sixth Circuit is "suspicious of methodologies created for the purpose of litigation, because 'expert witnesses are not necessarily always unbiased scientists.'" *Mike's Train House*, 472 F.3d at 408 (quoting *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1352 (6th Cir.1992)); *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (holding that a "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"). That Mr. Haas's Bass Model opinions were "created for the purposes of litigation" further counsels in favor of their exclusion. *Mike's Train House*, 472 F.3d at 408.

### B. Mr. Haas Is Not Qualified to Offer an Expert Opinion Regarding the Application of the Bass Model to Calculate Lost Sales.

Though the lost profits damages calculations in Mr. Haas's report derive entirely from his calculation of Fuse Chicken's purported lost sales using the Bass Model, Mr. Haas does not possess any "specialized knowledge" regarding the theoretical underpinnings of the Bass Model, the determination of the inputs that the model uses, or the application of the Bass Model to determine lost sales (if such application is even possible). Fed. R. Evid. 702(a).

#### 1. Mr. Haas had no knowledge of the Bass Model prior to August 2018.

Unsurprisingly, given that Mr. Haas was not aware the Bass Model existed until six months ago, it was not his idea to use that model to calculate lost sales in this case. Instead, its use was suggested to Mr. Haas by Fuse Chicken's marketing expert, Dr. Margaret Campbell, in August 2018. Barnhart Decl. Ex. A (Haas Dep. Tr.) 30:6-18 (Bass Model "was a model that I had not personally been aware of prior to the discussions I had with Dr. Campbell."). Dr. Campbell does not purport to be a damages expert, and has no apparent expertise related to the determination of lost sales or profits. Nevertheless, Dr. Campbell ████████ for the Bass Model to Mr. Haas, and he relied on her recommendation to use the Bass Model to

7

calculate Fuse Chicken's purported lost sales in this case. *Id.* Ex. C (Haas notes) at FCEXP00000953; *see id.* Ex. A (Haas Dep. Tr.) 22:5-23:7, 30:6-18, 45:4-9, 112:4-24, 114:24-115:5.

### 2. Mr. Haas has no specialized knowledge regarding the construction or implementation of the Bass Model.

When it came time for Mr. Haas to build and implement the Bass Model in this case, he needed to consult with someone else "to make sure [he] was getting the most reliable results." Barnhart Decl. Ex. A (Haas Dep. Tr.) 25:20-26:21. Presumably because none of the other damages experts at his firm, nor anyone else he knows professionally, had any familiarity with the Bass Model, Mr. Haas sought guidance from Fuse Chicken's counsel, who recommended that Mr. Haas speak with an Associate Professor of Marketing at the U.S.C. Business School, Lan Luo. *Id.* 24:20-26:2 ("Q. How were you introduced to Professor Luo? A. I believe counsel for Fuse Chicken identified her as somebody that I could speak to. They identified her, I'm not exactly sure how, but they suggested that she would be somebody that I could speak to."). Fuse Chicken did not disclose Professor Luo as an expert or potential fact witness.

Mr. Haas had never heard of Professor Luo or spoken with her previously. *Id.* Nor did Mr. Haas independently investigate, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* 134:6-12. Yet it was Professor Luo who determined key aspects of Mr. Haas's implementation of the Bass Model.

For example, to construct and run the Bass Model in this case, Mr. Haas relied entirely on software called "DecisionPro," which Professor Luo recommended he use. *Id.* 133:3-135:21. Mr. Haas has no basis for his assumption that the DecisionPro software is reliable other than his ███████████████████████████████████████████████████████████████████████████████

████ *Id.* Nor is there any evidence that Mr. Haas understands the intricacies of *how*

8

DecisionPro constructs or implements the Bass Model. *See, e.g., id.* 173:22-24 ▮

### 3. Mr. Haas has no specialized knowledge regarding the determination of any of the input variables used in the Bass Model.

Mr. Haas did not personally determine any of the values used for the four Bass Model input variables (A, M, p, q)—nor does he possess the expertise to do so. The values Mr. Haas used for the A variable (in Mr. Haas's implementation, Fuse Chicken's actual sales through May 2018) derived entirely from Fuse Chicken's historical sales data, which was provided to Mr. Haas by Fuse Chicken (and which Mr. Haas did not question). As for the p and q variables—respectively, the "▮

▮

▮

▮," Dkt. 97 (Haas Exp. Rpt.) ¶ 75—Mr. Haas admitted that ▮

▮ Barnhart Decl. Ex. A (Haas Dep. Tr.) 176:22-178:5, and ▮

▮, *id.* 176:15-21. Lacking personal expertise, Mr. Haas instead ▮

▮. *Id.* 175:17-176:21. Mr. Haas admitted that ▮

▮. *Id.* 173:16-174:8, 175:17-176:4. Finally, as detailed *infra* at 11-14, to determine the M variable—in Mr. Haas's implementation, the projected "market size" for Fuse Chicken's products, in the aggregate—Mr. Haas relied blindly on unsubstantiated and untested sales estimates provided by Fuse Chicken's CEO and head of sales for purposes of this litigation. Dkt. 97 (Haas Exp. Rpt.) ¶¶ 79-82.

In sum, Mr. Haas did nothing more than plug inputs provided by others into an off-the-shelf software package whose inner workings he does not understand, to implement a model he had never heard of before. He substituted Professor Luo's purported expertise in the proper

construction and implementation of the Bass Model—which Amazon did not have the opportunity to test—for his own, and he drew conclusions in reliance on that methodology—which he does not understand—to calculate Fuse Chicken's purported lost sales and profits.  Mr. Haas therefore did not rely "on his own skills, education, or experience," as he was required to do, to construct and implement the Bass Model in this case, nor could he, since he lacks any expertise regarding that methodology.  *Huffman*, 129 F. Supp. 3d at 540 (granting motion to exclude expert testimony).  Mr. Haas should not be permitted to present his rubber-stamped conclusions as "expert" opinion.  *See Mike's Train House*, 472 F.3d at 409 (reversing trial court's admission of expert testimony based "upon the opinion of others who were not even qualified as experts, nor present at the trial") (quoting *Taylor*, 364 F.2d at 613).

Mr. Haas's admitted lack of expertise regarding application of the Bass Model cannot be excused by virtue of his general experience with "regression tools" (of which the Bass Model is purportedly one type).  *See* Barnhart Decl. Ex. A (Haas Dep. Tr.) 34:8-19.  Expertise in "regression tools" generally does not equate to expertise in every *type* of regression model in existence, even assuming the Bass Model could be characterized as such: "Expertise in the technology of fruit is not sufficient when analyzing the science of apples[.]"  *Huffman*, 129 F. Supp. 3d at 537 ("[C]ourts have excluded the testimony of engineers because their expertise was not particular to the science involved in the case."); *see also Newell*, 2010 WL 2643417, at *3 (granting motion to exclude opinions about alleged forklift defect by accomplished mechanical engineer with no specific experience with forklifts).  As Mr. Haas admitted, he does not "have knowledge or experience using every regression tool that's available."  Barnhart Decl. Ex. A (Haas Dep. Tr.) 35:5-16.

Because Mr. Haas does not possess any "specialized knowledge" regarding the Bass Model, and "[a]ll of his opinions regarding [the Bass Model] were formed in connection with litigation," those opinions should be excluded under Rule 702.  *Newell Rubbermaid*, 2010 WL 2643417, at *4.

### C. Mr. Haas's Application of the Bass Model Relies Entirely on Self-Serving and Untested Assumptions Provided by Fuse Chicken Management.

Mr. Haas's calculation of Fuse Chicken's purported lost sales using the Bass Model relies on the value used for the M variable—which, per Mr. Haas, corresponds to the total number of unit sales of all of its various products that Fuse Chicken *expected* to achieve over the lifetime of the company, absent alleged infringement. Dkt. 97 (Haas Exp. Rpt.) ¶ 75. To determine the value of the M variable, Mr. Haas relied on Fuse Chicken management's ▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉—though the highest amount of monthly sales Fuse Chicken made prior to November 2016 was ▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id.* ¶ 79 & Ex. 8.1. Mr. Haas did not derive this purported sales *expectation* from any sales *projection* made in the ordinary course of Fuse Chicken's business. Instead, Fuse Chicken's CEO and its Head of Sales provided these numbers to Mr. Haas nine days before his expert report was due, and Mr. Haas accepted them without question. *Id.*; *see* Barnhart Decl. Ex. D (Haas notes) at FCEXP00000078.[2] In short, Mr. Haas's Bass Model opinions derive from "the mere say-so of two [Fuse Chicken] executives." *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 826 (S.D. Ind. 2012) (excluding damages expert opinion based on executives' "conclusory assertions" that expert "accepted . . . at face value without knowing whether they have any evidentiary support").

Mr. Haas's report does not reference Fuse Chicken's actual course-of-business sales estimates or indicate that Mr. Haas did anything else to test the reliability of the company's last-minute "expectation[s]," despite obvious red flags. *See* Dkt. 97 (Haas Exp. Rpt.) ¶ 79. Fuse Chicken management's sales "expectations" are not substantiated by, or even remotely consistent

---

[2] Though Mr. Haas claims to have ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Dkt. 97 (Haas Exp. Rpt.) ¶ 81.

11

with, the actual sales projections the company made during the course of business. Fuse Chicken's CFO testified that, ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮, see Dkt. 97 (Haas Exp. Rpt.) Ex. 4.1.[4] Moreover, Fuse Chicken's Head of Sales testified—just months before providing Mr. Haas with his unsubstantiated and extravagant sales estimates— that ▮▮▮▮▮

▮▮▮▮▮." Barnhart Decl. Ex. F (Siegl Dep. Tr.) 248:6-16. And Fuse Chicken's CEO's August 2018 deposition testimony left little doubt that the sales estimates relied on by Mr. Haas were entirely litigation-driven: after testifying that ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮." Id. Ex. G (Fuse Chicken 30(b)(6) Dep. Tr.) 239:16-241:24, 243:18-23. Less than two months later, Fuse Chicken management provided the peak unit sales estimate on which Mr. Haas's Bass Model relies to Mr. Haas. Id. Ex. D (Haas notes) at FCEXP00000078.

Mr. Haas's sole reference to the reliability of Fuse Chicken's last-minute, litigation-driven projections is his conclusory observation that ▮▮▮▮▮

▮▮▮▮▮." Dkt. 97 (Haas Exp. Rpt.) ¶ 79. But that observation *itself* is based entirely on Fuse Chicken's CEO's belief that "▮▮▮

---

[3] Barnhart Decl. Ex. E (C. Fawcett Dep. Tr.) 137:17-25 ▮▮▮

▮▮▮

▮▮▮). Fuse Chicken's actual 2017 product sales revenue was approximately ▮▮▮. Dkt. 97 (Haas Exp. Rpt.) Ex. 10.1.

[4] *See also* Dkt. 97 (Haas Exp. Rpt.) Ex. 6.1 (for lowest-case scenario, projecting approximately ▮▮▮ in but-for sales revenue in 2017).

12



." *Id.* n.115. Mr. Haas's report does not reflect any independent analysis of whether Fuse Chicken *could have actually* "

." *Id.* ¶ 79; *compare id.* Ex. 4.1 (projecting ▮ but-for unit sales in November 2018), *with id.* Ex. 8.1 (showing pre-November 2016 monthly unit sales highwater mark of ▮). "Without some foundation to substantiate the legitimacy" of this assumption, "any lost profits calculations based on these figures are speculative and inherently unreliable." *Otis v. Doctor's Assocs., Inc.*, 1998 WL 673595, at *6 (N.D. Ill. Sept. 14, 1998) (excluding expert opinion regarding lost profits calculations when there was no evidence "that establishing the target numbers of 89 or 121 Cajun Joe's franchises in Chicago was a reasonable goal that could be achieved in the time period provided").

The disconnect between Fuse Chicken management's hoped-for sales levels and reality is apparent in the below graphic from Mr. Haas's report, which compares Fuse Chicken's actual historical sales—the black solid line—to Mr. Haas's three projected lost sales scenarios using the Bass Model—the red, green, and blue dotted lines. The Bass Model scenarios represent the sales Mr. Haas determined Fuse Chicken *would have* achieved absent the alleged conduct by Amazon, based on the unreliable M variable value he calculated using the untested and unsupported projections provided by management:

13



Even if the Bass Model were a reliable methodology for determining lost sales, and even if Mr. Haas were qualified to opine on the use of the Bass Model—neither of which is true—"blind adherence to data absent any sort of independent investigation stops short of the type of reliability contemplated by *Daubert*[.]" *Bruno*, 311 F.R.D. at 137.  Fuse Chicken's CEO and Head of Sales's untested and "unsupported speculation with no reasonable factual basis" cannot form the basis of an *expert* opinion.  *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264, at *7-9 (W.D. Tenn. June 30, 2015) (granting motion to exclude); *see also Otis*, 1998 WL 673595, at *5 (excluding expert damages opinion based on sales projection assumptions that were nothing "more than aspirational hopes"); *JRL Enters., Inc. v. Procorp Assocs., Inc.*, 2003 WL 21284020, at *7–8  (E.D. La. June 3, 2003) (collecting cases in which courts have excluded expert opinions "where the expert failed to conduct any independent research to determine the reliability of his assumptions").  This Court should therefore preclude Fuse Chicken from "presenting its own estimation of damages in the guise of an expert opinion." *JRL Enters.*, 2003 WL 21284020, at *8.

**D.  Mr. Haas's Damages Opinion Relies on and Falls with Dr. Ghose's Causation Opinion.**

Fuse Chicken's ability to recover the ▬▬▬▬▬▬ in lost profits Mr. Haas calculated using the unreliable Bass Model necessarily depends on proof that Amazon *caused*

14

Fuse Chicken to lose those purported profits. As detailed in Amazon's Motion for Summary Judgment, there is no evidence to support Fuse Chicken's causation theory. Dkt. 119-1 at 26-30.

Mr. Haas nevertheless assumes causation for purposes of his damages opinion and relies entirely on Fuse Chicken's expert Dr. Ghose's opinions for that assumption. *See* Barnhart Decl. Ex. A (Haas Dep. Tr.) 68:11-18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). As explained in Amazon's Motion to Exclude Certain Opinions of Anindya Ghose, Dkt. 125-1, among many other problems with Dr. Ghose's opinions, there is no reliable basis for Dr. Ghose's specific opinion that Fuse Chicken lost *international* sales due to negative reviews on Amazon.com, the *United States* marketplace.

But Mr. Haas's damages calculations all uniformly assume *global* lost profits, and he provides no calculations of what lost profits would be if they were limited to the United States, or even North America, alone. Barnhart Decl. Ex. A (Haas Dep. Tr.) 75:21-76:9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Accordingly, if the Court excludes Dr. Ghose's opinions related to damages causation with respect to *international* sales, Mr. Haas's damages calculation must also be excluded since it necessarily assumes that such causation can be proved at trial.

IV. **CONCLUSION**

For the foregoing reasons, the Court should (1) preclude Mr. Haas from presenting any opinion regarding the Bass Model, including any calculations of purported lost sales or profits determined using the Bass Model, at trial or at any other stage of these proceedings; and (2) strike paragraphs 21, 68-69, 73-89, 98-99, and 104, and exhibits 3-7, of Mr. Haas's report. In addition, should the Court grant Amazon's motion to exclude Dr. Ghose's opinion regarding international reliance on Amazon.com reviews, the Court should strike paragraphs 63-66 and 106 of Mr. Haas's report, which rely on and assume Dr. Ghose's opinion as true.

| | |
|---|---|
| DATED: February 21, 2019 | */s/ Clara J. Shin* |
| | Clara J. Shin (admitted *pro hac vice*) |
| | Nathan E. Shafroth (admitted *pro hac vice*) |
| | Lindsey Barnhart (admitted *pro hac vice*) |
| | David S. Watnick (admitted *pro hac vice*) |
| | COVINGTON & BURLING, LLP |
| | |
| | Roger M. Synenberg (#32517) |
| | Clare C. Moran (#81134) |
| | SYNENBERG, COLETTA & MORAN, LLC |
| | |
| | *Attorneys for Defendant Amazon.com, Inc.* |

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2019, a copy of the foregoing Amazon.com, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas and Memorandum of Points and Authorities in Support Thereof, and accompanying declaration and exhibits, was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Clara J. Shin*