# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| FUSE CHICKEN, LLC | ) | CASE NO. 5:17-cv-01538-SL |
| | ) | |
| Plaintiff, | ) | Hon. Sara Lioi |
| | ) | Hon. Kathleen B. Burke |
| vs. | ) | |
| | ) | |
| AMAZON.COM, Inc., et. al., | ) | **FUSE CHICKEN, LLC'S OPPOSITION TO** |
| | ) | **AMAZON.COM, INC.'S MOTION TO** |
| | ) | **EXCLUDE CERTAIN OPINIONS OF** |
| Defendant(s). | ) | **PLAINTIFF'S EXPERT DAVID HAAS AND** |
| | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT THEREOF** |

Pursuant to Federal Rule of Evidence 702, Fuse Chicken, LLC respectfully submits this opposition to Amazon.com, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas and Memorandum of Points and Authorities in Support Thereof.

**TABLE OF CONTENTS**

I.      Introduction..................................................................................................... 1

II.     Argument ......................................................................................................... 3

       **A.**     Legal Standard ........................................................................................ 3

       **B.**     Haas Used A Well-Established, Widely Accepted, And Reliable Method
              for Estimating Product Diffusion Of Fuse Chicken's Products............................ 3

       **C.**     Haas Is Qualified To Calculate Fuse Chicken's Damages ..................... 7

       **D.**     Haas Reliably Used The Bass Model................................................... 10

       **E.**     Haas Tested And Reasonably Relied On The Data Provided To Him ................. 11

       **F.**     Haas's Application Of The Bass Model Is Capable Of Replication.................... 14

III.    CONCLUSION........................................................................................... 15

i

## I.    Introduction

David Haas is a thirty plus year intellectual property valuation veteran. To estimate the harm to Fuse Chicken—a relatively young but dynamic company—caused by Amazon's infringement of Fuse Chicken's intellectual property, he engaged in a four step process. Using Fuse Chicken's historical sales data, Haas: (1) calculated Fuse Chicken's lost sales after the infringement period started; (2) analyzed Fuse Chicken's present manufacturing capacity; (3) analyzed Fuse Chicken's incremental expected costs; and (4) discounted future cash flows back to present value dollars. As a part of one step, he employed a regression analysis[1] known as the Bass Model to forecast the future sale of Fuse Chicken's products. Drawing on his years of experience, Haas analyzed the information provided by Fuse Chicken, determined how the Bass Model's variables should be set, and performed the calculations. He then used the results, among other information, to inform his opinions.

Amazon seeks to exclude most of Haas's opinions on the basis that he employed the Bass Model as one part of his damages analysis. Amazon's arguments are based on a misapplication of the facts and a misunderstanding of the law. First, Amazon incorrectly contends that Haas used the Bass Model to "calculat[e] lost sales or litigation damages." Dkt. 142 at 8. In fact, Haas used the Bass Model as it was intended, to project future sales. The Bass Model is a widely lauded and tested regression tool that has been used repeatedly in peer reviewed papers since it was first developed in the 1960s. In many instances, it has been used to forecast reliably sales for early stage products or companies. For example, in his 1967 working paper, Dr. Frank Bass himself successfully used the Bass Model to forecast the sales of 2 4-D Weed Spray and a newly introduced prescription

---

[1] A regression analysis "is a statistical tool" "for quantifying the impact of changes in one or more explanatory variables (known as independent variables) on a variable of interest (known as the dependent variable)." Robert Mills & Dubravka Tosic, *Regression Analysis Applications in Litigation*, 1 (2011). Courts routinely permit expert damage testimony that is based on regression models. *See, e.g.*, *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002).

1

medication. Since that time, it has been used to model diffusion of a range of products and groups of products such as DIRECTV, a new car, a neurostimulator, the Xerox Docu Tech family of products, the iPhone, and the Samsung Galaxy phone.

Second, Amazon asserts—with no basis—that Haas lacked the skills necessary to apply the Baas Model. However, Haas, like Amazon's damages expert, Greg Regan, has used well-accepted regression analyses in many damages calculations. Amazon attempts to undermine Haas's credibility by stressing that Haas first learned about the Bass Model from Dr. Margaret Campbell, Fuse Chicken's marketing and survey expert and a widely-published academic. This fact is irrelevant. Haas conducted his own research before deploying the Bass Model and has the expertise to run it reliably. Amazon also emphasizes that Haas spoke with a consulting expert, Dr. Lan Luo, another academic in the field of marketing and business, about his implementation of the Bass Model. But, such consultation only strengthens and confirms Haas's choice to employ the Bass Model in this case; it certainly does not diminish it. In any event, Haas determined how its variables were set, he ran the Bass Model himself, and he analyzed the results. Dr. Luo's academic confirmation of his choice of models does not alter these facts.

Third, Amazon wrongly claims that Haas blindly accepted Fuse Chicken's sales projections as the basis for the M variable in the Bass Model. However, as explained in the Report and at deposition, Haas analyzed the hard sales data provided to him by Fuse Chicken and put the projections in the context of the company's positive sales trajectory. Further, Amazon's arguments ignore the multistep process Haas engaged in to formulate the M variable.

In sum, Amazon attempts to bend the law and facts to exclude a model that Amazon's expert did not test, though he had the opportunity to do so. As such, it seeks to remove from the jury its right to evaluate the Report. *See In re High Pressure Laminates Antitrust Litig.*, No. 00 MDL 1368

2

(CLB), 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) ("The jury is the proper body to decide whether or not and, if so, to what extent, [the expert's] model should be discredited."). Accordingly, the Motion should be denied.

## II. Argument

### A. Legal Standard

Though the party offering the expert must demonstrate admissibility by a preponderance of the evidence, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993), that party does "not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). Instead, "they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* Further, motions to exclude expert testimony "should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *Funk v. Rent All Mart, Inc.*, No. 3:00 CV 7086, 2002 WL 34417021, at *1 (N.D. Ohio July 9, 2002). The "rejection of expert testimony is the exception rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quotations omitted); *see also* Fed. R. Evid. 702, Adv. Comm. Notes (2000).

### B. Haas Used A Well-Established, Widely Accepted, And Reliable Method for Estimating Product Diffusion Of Fuse Chicken's Products

Product diffusion is the process by which an innovation is communicated through a group of people, such as consumers. *See* Rand Decl. Ex. 1 at 85. In the 1960s, Dr. Frank Bass realized that diffusion could be measured and, therefore, modeled. Though Dr. Bass published his research on the diffusion of color televisions—using two and a half years of data to model diffusion more successfully than the television industry and financial analysts, *see* Dkt. 142-3 at 3—he developed it by analyzing a wide range of products. In his initial 1967 working paper, Dr. Bass successfully

3

applied his model to individual products, such as 2 4-D Weed Spray, a pesticide, and a newly introduced prescription drug. *See* Rand Decl. Ex. 2 at 26-27.

Since that time, the Bass Model has become "one of the most widely applied models" for estimating diffusion. Dkt. 142-3 at 2. Hundreds of academic studies have successfully used the Bass Model to explain diffusion and Dr. Bass's four papers on the Bass Model have been cited nearly 13,000 times. It is also taught in business schools across the country. In fact, Dr. Kevin Keller, Amazon's branding expert, relies on Dr. Bass's research in his textbook. *See* Rand Decl. ¶ 3; Ex. 19; Ex. 14; Ex. 3 at G81; Ex. 4. For his work, Dr. Bass was nominated for a Nobel Prize.[2]

The Bass Model's wide application includes successfully forecasting successive generations of technology, entire brands, and individual products. *See id*. Ex. 1 at 87, 89; Ex. 3 at G81-82. Two years before launching its product, DIRECTV hired Dr. Bass to model its diffusion over a five year period. He relied solely on management's projections and found that his forecast was "quite good in comparison with actual diffusion." *Id*. Ex. 5 at S82, S89-92. Researchers have also used the Bass Model to forecast sales for a new car model, a neurostimulator device (which was done without any historical sales data), the Xerox Docu Tech family of products, a new Vitamin D test kit, the iPhone, and the Samsung Galaxy phone. *See id*. Exs. 1, 6-9. RCA used the Bass Model to forecast the sale of CD players, and European movie exhibitors use it to forecast box office revenues. *See id*. Ex. 10. Researchers have also used a substantially similar model to analyze the entry of Kodak into the instant camera market, which was dominated by the incumbent, Polaroid. *See id*. Ex. 11  at 45-47.

Haas used the Bass Model for one of the purposes for which it was designed: to accurately predict the future sales Fuse Chicken would have enjoyed but for Amazon's conduct. *See* Dkt. 97 ¶

---

[2] Informs, *Who is Frank Bass* (accessed on Mar. 9, 2019), https://www.informs.org/Recognizing-Excellence/Community-Prizes/Marketing-Science-Society/Frank-M.-Bass-Dissertation-Paper-Award/Who-Is-Frank-M.-Bass.

68. By applying it to Fuse Chicken's historical, pre-infringement sales, ██████████████

████ [3] ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. *See id*. ¶¶ 68, 75, 77.

Haas's reliable application of the Bass Model—a peer reviewed, extensively studied methodology—

in accordance with one of its generally accepted uses is sufficient to satisfy Rule 702. *See Best v.*

*Lowe's Home Centers, Inc.*, 563 F.3d 171, 176-77(6th Cir. 2009).

      Amazon's arguments to the contrary are unavailing. Amazon misleadingly and repeatedly

states that Haas used the Bass Model to "calculat[e] lost sales or litigation damages." Dkt. 142 at 4,

8; *see also id*. at 10. However, Haas did not use the Bass Model alone to calculate lost sales or

measure Fuse Chicken's damages. Instead, the Bass Model was *part* of the ████████████████

████████████. *See* Dkt. 97 ¶ 68. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████. *Id*. ¶ 86. ████████████████████████████████████████████████

████████████. *See id*. ¶¶ 69-72 (summarizing the four steps).

      Amazon also argues that "Haas's use of the Bass Model must be excluded because the model

lacks 'general acceptance' in the 'relevant scientific community.'" Dkt. 142 at 4 (quoting *Daubert*,

509 U.S. at 593-94). First, it is generally accepted. Second, Amazon's use of "general acceptance" as

a bright line test for admissibility is precisely what the Supreme Court overruled in *Daubert*.

*Daubert*, 509 U.S. at 589 ("*Frye* made 'general acceptance' the exclusive test for admitting expert

scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of

---

[3] ████████████████████████████████████████████████████████ Dkt. 97 ¶ 83.

Evidence, should not be applied in federal trials." (footnote omitted)). Instead, "general acceptance" is one part of a court's flexible and preliminary enquiry into "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. There is no question that the Bass Model satisfies the standard: it is a scientifically valid and generally accepted way to measure the diffusion of relatively new products, such as Fuse Chicken's. *See supra*.

*Daubert* also forecloses Amazon's contention that the Court must exclude the Report because Amazon found no other case in which an expert used the Bass Model. *See* Dkt. 142 at 5-6. *Daubert* is premised on the proposition that science is an evolving field that changes over time. *See Daubert*, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."). If experts are limited just to those methodologies that have been previously admitted, then no scientific developments, no matter how well-established, could be presented to a jury. For example, in *United States v. Coleman*, 202 F. Supp. 2d 962 (E.D. Mo. 2002), the court was confronted with whether to admit "novel scientific evidence" in the form of mitochondrial DNA analysis. *Id.* at 968. Though mitochondrial DNA "had little judicial scrutiny," the court still found the expert opinion to be reliable and denied the defendant's motion to exclude. *See id.* at 965-66, 970. If Amazon is correct, then no court could ever have admitted such evidence.

Amazon cites Haas's lack of familiarity with the Bass Model before consulting with Dr. Margaret Campbell as further evidence for why the Report should be excluded. *See* Dkt. 142 at 7-8. This fact is largely irrelevant to whether Haas's damages analysis complied with Rule 702. Even so, it shows that Haas acted reasonably. During the process of calculating Fuse Chicken's damages, Haas determined that a regression model was appropriate for determining Fuse Chicken's future

6

sales. *See* Rand Decl. Ex. 12 at 88:6-19. As Amazon's expert, Regan, recognized, there are many types of regression models. *See id.* Ex. 13 at 218:9-16. In order to identify the model best suited for this case, Haas spoke with Dr. Campbell, the Provost Professor of Marketing at the Leeds School of Business, University of Colorado Boulder. *See* Dkt. 142-2 at 30:6-18. After Dr. Campbell recommended he consider the Bass Model, ███████████████████████████████████████ ████████████████████████ *See* Rand Decl. Ex. 12 at 110:17-112:13, 113:1-6.

The cases cited by Amazon are inapplicable. In *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006), and *Feduniak v. Old Republic National Title Co.*, No. 13-cv-02060-BLF, 2015 WL 1969369 (N.D. Cal. May 1, 2015), the experts invented new methodologies for litigation that were never peer reviewed, did not possess known or potential error rates, and were not generally accepted in the industry. *See Lionel*, 472 F.3d at 407; *Feduniak*, 2015 WL 1969369, at *3-4. Further, in both cases, the experts' methodologies could not capture what they sought to measure. The expert in *Lionel* was supposed to assess whether trade secrets about the design and manufacture of model trains were misappropriated but his model did not account for the process by which the trains were designed and manufactured. *See Lionel*, 472 F.3d at 408. In *Feduniak*, the expert was hired to calculate the diminution in value to a property caused by an easement. But, in his model comparing the value of the property at issue to other properties in the neighborhood, he did not identify other properties with similar easements. *See Feduniak*, 2015 WL 1969369, at *2-3. In contrast, Haas used the Bass Model to measure what it was designed to measure, the diffusion of Fuse Chicken's products. Further, thousands of peer reviewed papers have been published using it.

### C.    Haas Is Qualified To Calculate Fuse Chicken's Damages

Over the past thirty years, Haas has been qualified to provide expert opinions on damages in ████████████████████ cases. Dkt. 97 ¶ 2; Rand Decl. Ex. 12 at 31:22-32:5. These cases include

7



. Dkt. 97 at 58. He drew on this vast well of knowledge to calculate reliably Fuse Chicken's damages in four steps: (1) ███████████ (2) ███████████████ (3) ███████ and (4) ███████████ *Id*. ¶¶ 68-72. Haas unquestionably has the experience to perform each of these well-established, generally accepted steps. *See Popovich v. Sony Music Entm't, Inc.*, 508 F.3d 348, 359 (6th Cir. 2007) (affirming the district court's finding that the damages expert was qualified on the basis of his "extensive experience").[4]

Despite this uncontested expertise in damages calculations, Amazon argues that most of the Report should be excluded because it claims that he lacked sufficient expertise to perform one part of one step of his analysis. *See* Dkt. 142 at 7-10. However, this argument is premised on a flawed understanding of the Bass Model. The Bass Model is a form of regression analysis and can be expressed in the form of an ordinary least squares regression ("OLS"), one of the most common regression forms. *See* Rand Decl. Ex. 18 at 60; Haas Decl. ¶ 4. Damages experts, including Regan, routinely use regression models in their analyses. *See* Rand Decl. Ex. 13 at 218:9-16, 224:23-225:13.

Haas has extensive education in and experience with statistical tools such as regressions. He took statistical classes in both undergraduate and graduate schools; these classes included lessons about regressions generally and OLS specifically. He also employed regressions in between twenty

---

[4] *See also Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 513 (D. Md. 2012) (finding "no reason to conclude" that an expert "cannot assist the trier of fact in the estimation of damages" when the expert "had extensive education and experience in the valuation of" intellectual property).

and thirty damages calculations and non-litigation intellectual property valuations. In many of these instances, he used the OLS method. *See* Haas Decl. ¶¶ 3-6.[5] This more than qualifies him to employ the Bass Model as part of his damages analysis. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 245-46 (3d Cir. 2008) (reversing the district court's holding that an expert was not qualified when the expert's "formal qualifications [were] unassailable," even though the expert was not "the best qualified" and lacked "the specialization that the District Court deemed necessary" (quotations omitted)).

Amazon argues that Haas's "[e]xpertise in 'regression tools' generally does not equate to expertise in every *type* of regression model in existence." Dkt. 142 at 13. This argument misses the point. Haas's education and training give him the ability to identify which specific valuation tools are necessary for an assignment and to deploy them in a reliable manner and tailored for the case at hand. "Requiring [further] specialization thwarts the goals and purposes of the Federal Rules." *Laski v. Bellwood*, No. 96-2188, 1997 WL 764416, at *3 (6th Cir. Nov. 26, 1997); *see also Logan v. Cooper Tire & Rubber Co.*, No. 10-3-KS, 2011 WL 3267883, at *4 (E.D. Ky. July 29, 2011) (following *Laski* and admitting an expert who had "significant experience and training").[6]

Further, Amazon has not shown that there is *anything* unique about the Bass Model that would differentiate it from any other regression models or require additional or specialized expertise to apply. If such differences did exist, which they do not, it would be an issue of weight for the jury, not admissibility. *See Robinson v. Geico Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) ("Gaps

---

[5] *See also* Rand Decl. Ex. 12 at 26:22-27:9.

[6] Amazon's cases do not warrant a different result. Both *Huffman v. Electrolux Home Products, Inc.*, 129 F. Supp. 3d 529 (N.D. Ohio 2015), and *Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 5:08CV2632, 2010 WL 2643417 (N.D. Ohio July 1, 2010), are product defect cases where the proffered experts had no foundation on which to opine about the proper design of the supposedly defective products. *See Huffman*, 129 F. Supp. 3d at 537-38; *Newell*, 2010 WL 2643417, at *3-4. Here, Haas has an extensive foundation on which to opine as to Fuse Chicken's damages.

in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." (quotation and citation omitted)).

    **D.**    **Haas Reliably Used The Bass Model**

    To implement the Bass Model, Haas used software provided by a company called DecisionPro, which was suggested by Dr. Luo because it is widely used and accepted in the industry. *See* Dkt. 142-2 at 24:20-26:2, 133:11-15; Rand Decl. Ex. 12 at 133:19-23. The company was founded by two leading marketing professors.[7] Its software, which is used by over 100 business schools worldwide,[8] accompanies a widely used marketing textbook, *Principles of Marketing Engineering and Analytics*.[9] *See* Haas Decl. ¶ 7; *see also* Rand Decl. Ex. 14; Ex. 15.

    Haas determined how each of the independent variables should be set, and he ran the Bass Model himself. ████████████████████████████████████████████ *See* Dkt. 97 ¶ 76; Rand Decl. Ex. 12 at 135:23-136:4. ██████████████████████

████████████████████████████████████████████████████████████

███████████████████████ *See* Dkt. 97 ¶¶ 79-83. The variables p and q are the coefficients of innovation and imitation, respectively. *Id*. ¶ 75. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ *See* Haas Decl. ¶¶ 8-9; Rand Decl. Ex. 12 at 173:13-21, 173:25-174:8, 174:23-

---

[7] DecisionPro, Our Team, http://www.decisionpro.biz/our-team.
[8] DecisionPro, Customer List, http://www.decisionpro.biz/instructors/new-instructors/customer-list.
[9] DecisionPro, Purchase Textbook, http://www.decisionpro.biz/store/students/purchase-textbook.

175:21. Once all the variables were set, Haas ran the Bass Model in Excel. *See id*. at 29:5-7, 132:23-133:2.[10]

Amazon attempts to argue that the Report is unreliable because he consulted with Dr. Luo, a retained but non-testifying consulting expert. *See* Dkt. 142 at 11-13. This fact alone does not warrant the exclusion of the Report under Rule 702. Moreover, Amazon ignores Haas's prior experience in using regression models and that Haas himself assigned the inputs for the Bass Model, made the assumptions underlying this particular application, and ran it. Dr. Luo did not change or disagree with any of Haas's inputs, nor did she run the Bass Model. *See* Rand Decl. Ex. 12 at 26:5-21, 28:11-29:7. Dr. Luo merely served as a consulting expert, giving further assurance to the soundness of Haas's work. Amazon has not—and cannot—explain why this makes the Report unreliable.

The reliability of Haas's application of the Bass Model is demonstrated by his R squared analysis. R squared is a measure of how closely the data is fitted to the line of regression. A value of one means that the model perfectly explains the data entered into it. A value of zero means that the model does not explain the data at all. *See id*. at 168:15-169:3. ███████████████

████████████████████████████████████████

███████████████. *See* Dkt. 97 ¶ 84.

### E.     Haas Tested And Reasonably Relied On The Data Provided To Him

Amazon asserts that Haas accepted Fuse Chicken's sales expectations without question. *See* Dkt. 142 at 14-16. However, Haas analyzed and evaluated this information against other facts in the

---

[10] Amazon tries to downplay the fact that Haas himself employed the Bass Model by stating that he "did nothing more than plug inputs" into "an off-the-shelf software package." Dkt. 142 at 12. But, the fact that it is straightforward does not make it unreliable. Indeed, it is industry standard for damages experts to use statistical tools built into or added onto Excel as part of their damages calculations. *See* Haas Decl. ¶¶ 5, 6. Haas did this when he ran the Bass Model. Just as damages experts often do with whatever regression tool or statistical analysis they employ in a given case, Haas plugged the data into the formula in Excel and then ran the formula.

case, including Fuse Chicken's historic sales patterns. Specifically, ███████████████

████████████████████████████ Dkt. 97 ¶ 75. ███████████████████



Amazon also raises questions about the accuracy of the estimate. *See* Dkt. 142 at 14-16.
However, the questions Amazon raises about "weaknesses in the factual basis of" the Report are
insufficient to exclude it as they "bear on the weight of the evidence rather than its admissibility."
*Lee v. Horton*, No. 2:17-cv-2766, 2018 WL 5729049, at *2 (W.D. Tenn. Oct. 2, 2018) (quotation and
citation omitted).

Moreover, Amazon's supposed "red flags" are actually red herrings, factors which Haas has
already accounted for or are irrelevant. For example, Amazon cites a supposed ███████████████

---

[11] Amazon criticizes Haas's ███████████████████ for also considering the ███████████████
███████████████. *See* Dkt. 142 at 14 n.2. However, that does not mean that the ████
████████████████████████████████████████████████.

███████████  Chris Fawcett, Fuse Chicken's bookkeeper. *See* Dkt. 142 at 15.[12] However, Chris Fawcett has limited knowledge about Fuse Chicken's sales and growth given that he has a full time job in another state and spends "maybe 15 hours" a month working for Fuse Chicken. *See* Rand Decl. Ex. 16 at 10:18-20, 32:19-20, 43:6-15. Amazon also states that James Siegl, Fuse Chicken's Head of Sales, testified ████████████████████████████████████████████████ ████████████████████████████████████ Dkt. 142 at 15 (quoting Dkt. 142-7 at 248:6-16). Here, Amazon mistakenly conflates ██████████████████████████████████ ██████████████████. Accordingly, Haas reasonably discounted this testimony when he reviewed Siegl's transcript. *See* Rand Decl. Ex. 12 at 153:11-154:13.[13]

Amazon claims that the testimony of Fuse Chicken's CEO leaves "little doubt" that the projections given to Haas were "litigation-driven." Dkt. 142 at 15. However, the fact that ███ ████████████████████████████████████████████████ ████████████████████████████, *see* Dkt. 97 ¶ 18, ████████████████████ ██████████████████. Further, the complete excerpt of Fuse Chicken's CEO's deposition makes clear that ██████████████████████████████. *See* Dkt. 142-8 at 239:16-22. Finally, Amazon claims that Haas does not "independent[ly] analy[ze]" whether ████████████ ██████████████████. Dkt. 142 at 16. But Haas testified that he did consider this as part of his analysis. *See* Rand Decl. Ex. 12 at 204:11-206:8.

---

[12] Amazon referred to Chris Fawcett as Fuse Chicken's CFO. *See* Dkt. 142 at 15. However, he described this as an inaccurate title given that 90% of his work is bookkeeping. *See* Rand Decl. Ex. 16 at 223:4-21.

[13] During his deposition, ████████████████████████████████████████████ ████████████████████████████████████████████. *See* Rand Decl. Ex. 17 at 241:2-244:8, 245:17-246:15, 256:12-257:19.

Given Haas's thorough analysis of the facts presented, Amazon's questions about the information on which Haas relied are, at most, an issue for the jury, not for the Court. *See In re High Pressure Laminates Antitrust Litig.*, 2006 WL 931692, at \*1 (finding that whether the expert "inappropriately uses or selects incorrect or misleading data" is for the jury to decide).[14]

### F.     Haas's Application Of The Bass Model Is Capable Of Replication

"[T]he ability of a theory or technique to assist the trier of fact turns on whether it can be (and has been) tested." *Benton v. Ford Motor Co.*, 492 F. Supp. 2d 874, 878 (S.D. Ohio 2007). Haas's use of the Bass Model is capable of such examination. Haas licensed a copy of the Bass Model from DecisionPro. Like many other regression tools commonly used by damages and valuations professionals, the DecisionPro Bass Model tool is an add-on in Excel. *See* Rand Decl. Ex. 12 at 85:24-86:2, 132:23-133:2. Accordingly, this part of his analysis, like the rest of it, is capable of replication by any other damages expert with Excel.

Inexplicably, Amazon states in its brief that it "did not have the opportunity to test" Haas's use of the Bass Model. Dkt. 142 at 12-13. Not so. DecisionPro is publicly available. Haas's "theories

---

[14] The cases on which Amazon relies are easily distinguished from this dispute. In *Bruno v. Bozzuto's Inc.*, 311 F.R.D. 124 (M.D. Pa. 2015), the expert did not conduct an internal investigation, did not know the industry about which he opined, and offered inconsistent opinions. *See id*. at 137. Further, unlike here, the models on which the expert relied "deviated significantly from observed data." *Id*. at 140-41. In *Otis v. Doctor's Associates, Inc.*, No. 94 C 4227, 1998 WL 673595 (N.D. Ill. Sept. 14, 1998), unlike here, the expert relied on a formula that was not shown to be accurate and a methodology that was not peer reviewed or published. *See id*. at \*4. In *Universal Coin & Bullion, Ltd. v. Federal Express Corp.*, No. 2:12-cv-2778-SHM-dkv, 2015 WL 12001264 (W.D. Tenn. June 30, 2015), the court found that there was "nothing" in the record to support the expert's assumptions. *Id*. at \*8, \*9. Here, the record contains support for Haas's opinions and is, at worst, contested. In *JRL Enterprises, Inc. v. Procorp Assocs., Inc.*, No. Civ. A 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003), the court found that the report was "devoid of any analysis of figures," *id*. at \*8, which is not the case here. Finally, in *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815 (S.D. Ind. 2012), the expert "accepted the[ ] opinions at face value without knowing whether they have any evidentiary support." *Id*. at 827 (citation omitted). Here, Haas did not accept the opinions of Fuse Chicken's executives at face value and he situated those opinions in the facts of the case, including Fuse Chicken's historical sales rate.

14

and conclusions are very easily tested by [Amazon's] experts, as they merely involve calculations." *Anderson v. Ridge Tool Co.*, No. 06-116-HRW, 2008 WL 3849923, at *5 (E.D. Ky. Aug. 14, 2008). Amazon had access to Fuse Chicken's sales data, just like Haas. Regan could have licensed the software and tried to model Fuse Chicken's product diffusion. The fact that he did not, *see* Rand Decl. Ex. 13  at 226:9-11, is not Fuse Chicken's fault. Thus, Amazon has no basis for questioning Haas's results from his application of the Bass Model as a reason for excluding his Report. *See In re Scrap Metal Antitrust Litig.*, 527 at 531-32 (finding that the district court did not abuse its discretion in admitting expert testimony when the expert's calculations were tested by defendants' expert); *see also Benton*, 492 F. Supp. 2d at 878-79 ("Defendant has not demonstrated that [the expert's] methodology has not been, or is incapable of, being tested.").[15]

## III.    CONCLUSION

For the reasons set forth herein, Fuse Chicken respectfully requests that the Court deny Amazon.com, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas.

---

[15] Amazon also argues that the Report should be excluded because there is no evidence for Fuse Chicken's causation theory, and it relies on Dr. Ghose's opinions. *See* Dkt. 142 at 17-18. Fuse Chicken has already responded to these meritless, boot-strapped arguments in its Opposition to Amazon's Motion for Summary Judgment, *see* Dkt. 157, and its Opposition to Amazon's Motion to Exclude Certain Opinions of Anindya Ghose, *see* Dkt. 133.

DATED: March 15, 2019                         */s/ Kathryn Lee Boyd*

Kathryn Lee Boyd (admitted *pro hac vice*)
Matthew P. Rand (admitted *pro hac vice*)
McKool Smith, P.C.
300 South Grand Avenue
Suite 2900
Los Angeles, California 90071
(213) 694-1180

Eric B. Halper (admitted *pro hac vice*)
Alyssa M. Pronley (admitted *pro hac vice*)
McKool Smith, P.C.
One Bryant Park
47th Floor
New York, New York 10036
(212) 402-9413

Joel A. Holt (#0080047)
Ickes\Holt
4301 Darrow Road, Suite 1100
Stow, Ohio 44224

*Attorneys for Plaintiff Fuse Chicken, LLC*

16

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 15, 2019, a copy of the foregoing Fuse Chicken, LLC's Opposition To Amazon.com, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas and Memorandum of Points and Authorities in Support Thereof was filed electronically and that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Alyssa M. Pronley*
Alyssa M. Pronley

1

## CERTIFICATION OF PAGE LIMIT COMPLIANCE

Pursuant to Local Rule 7.1 and the Initial Standing, Dkt. 4, I hereby certify on March 15, 2019 that Fuse Chicken, LLC's Opposition to Amazon.com, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas and Memorandum of Points and Authorities in Support Thereof complies with page limits set by this Court for nondispositive motions.

/s/ *Alyssa M. Pronley*
Alyssa M. Pronley

2