# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| FUSE CHICKEN, LLC, | ) Case No. 5:17-cv-01538-SL |
| | ) |
| Plaintiff, | ) Hon. Sara Lioi |
| v. | ) Hon. Kathleen B. Burke |
| | ) |
| AMAZON.COM, INC. | ) **AMAZON.COM, INC.'S REPLY** |
| and DOES 1–10, | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT OF** |
| Defendant(s). | ) **MOTION TO EXCLUDE CERTAIN** |
| | ) **OPINIONS OF PLAINTIFF'S EXPERT** |
| | ) **DAVID HAAS** |

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. ARGUMENT ......................................................................................................... 2

    A. Fuse Chicken Fails to Establish That the Bass Model Is a Reliable Methodology for Calculating Lost Sales. .............................................. 2

    B. Fuse Chicken Fails to Establish That Mr. Haas Is Qualified to Opine on the Application of the Bass Model to Calculate Lost Sales. .................................. 5

        1. Fuse Chicken concedes Mr. Haas had no knowledge of the Bass Model prior to August 2018. ......................................................................... 6

        2. Fuse Chicken fails to show that Mr. Haas has specialized knowledge regarding the construction or implementation of the Bass Model. .................................................................................................. 6

        3. Fuse Chicken cannot demonstrate Mr. Haas's specialized knowledge merely by insisting he has it. ...................................................... 7

        4. Mr. Haas's general experience with "regression analyses" does not satisfy the requirement that he possess specialized knowledge regarding implementation and use of the Bass Model. ............................... 8

    C. Fuse Chicken Fails to Establish that Mr. Haas's Bass Model Analysis Has a Reliable Factual Basis. ........................................................................ 10

        1. Mr. Haas did not independently analyze the reliability of Fuse Chicken management's peak monthly sales estimate. ..................... 11

        2. Mr. Haas ignored Fuse Chicken's actual course-of-business sales estimates and other contradictory evidence. ............................................. 12

        3. Amazon's Motion challenges the *reliability* of Mr. Haas's opinions. .................................................................................................. 14

    D. Fuse Chicken Agrees That Mr. Haas's Damages Opinion Is Inextricably Tied to Dr. Ghose's Causation Opinion. ............................................. 15

III. CONCLUSION ................................................................................................... 15

i

I.      **INTRODUCTION**

Fuse Chicken does not dispute that the Bass Model has never been used to calculate lost sales or litigation damages.  Nor does Fuse Chicken deny that the Bass Model has never been employed, as Mr. Haas does in this case, to project a single company's sales of all of its various product categories, in the aggregate.  Fuse Chicken also does not dispute that the Bass Model was developed for an entirely different purpose: to model the rate at which a given customer base will adopt multiple companies' products in a single product category.

Ignoring its burden to show the reliability of Mr. Haas's *application* of the Bass Model, Fuse Chicken instead devotes its Opposition to defending the Bass Model itself.  According to Fuse Chicken, "thousands of peer reviewed papers have been published using" the Bass Model. Dkt. 179 ("Opp.") 9.  Yet not a single one of the dozen articles Fuse Chicken attaches to its Opposition—none of which Mr. Haas disclosed in his expert report—contemplates Mr. Haas's unprecedented application of the Bass Model to calculate a company's total projected sales of all of its various product lines.

That Mr. Haas incompetently and unreliably applied the Bass Model for a purpose to which it is not indicated is unsurprising, since he knew nothing about the Bass Model until two months before his expert report was due.  Fuse Chicken concedes that Mr. Haas had *never even heard of* the Bass Model until August 2018.  Lacking the required specialized knowledge of or personal expertise with the Bass Model, Mr. Haas relied on (1) an academic whose qualifications he did not investigate and whose expertise he assumed based solely on the word of Fuse Chicken's counsel, and (2) a software program whose operation he does not understand.  Fuse Chicken attempts to distract from the absence of Mr. Haas's "own skills, education, or experience" to apply the Bass Model by touting his experience with "regression analyses" generally.  Amazon challenges Mr. Haas's *specific* application of the Bass Model in this case, not his general opinions regarding regression analyses, and the mere fact that Mr. Haas has knowledge regarding the use of *other* types of regression tools in *other* contexts does not imbue

him with the requisite "specialized knowledge" to reliably and competently explain the proper application of the Bass Model to the jury in this case.

Fuse Chicken's Opposition further confirms that Mr. Haas's Bass Model opinions are not supported by reliable facts.  Fuse Chicken identifies no evidence to contradict what Mr. Haas admitted in his expert report: that his calculation of lost sales and lost profits using the Bass Model derive entirely from unchecked sales estimates provided by Fuse Chicken management.  And Fuse Chicken concedes that Mr. Haas's damages calculations necessarily assume that Fuse Chicken lost sales in *international* marketplaces due to negative reviews on Amazon.com, the *United States* marketplace.  That assumption turns on the unreliable opinion of Fuse Chicken's expert Anindya Ghose; so if Amazon's motion to exclude Dr. Ghose's unreliable opinion succeeds, Mr. Haas's derivative opinion necessarily falls as well.

Fuse Chicken asks to be excused for its evidentiary and legal deficiencies because, it claims, Amazon's expert witness, Greg Regan, did not undertake an analysis to *disprove* the accuracy of Mr. Haas's Bass Model calculations.  Fuse Chicken misapprehends the burden of proof.  As the party offering Mr. Haas's opinions, *Fuse Chicken* is required to show: that the Bass Model is a reliable methodology from which damages may be calculated; that Mr. Haas has the specialized knowledge to reliably apply the Bass Model for that purpose; and that Mr. Haas's application of the Bass Model to calculate alleged lost profits rests on a reliable factual basis.  Fuse Chicken has done none of those things.  The jury has no inherent "right to evaluate" Mr. Haas's expert report.  Opp. 4.  To the contrary, the Court, as "gatekeeper," must exclude expert opinions from the jury's consideration when, as here, the opinions rest on unreliable methodology or facts and the expert lacks the requisite knowledge to offer the opinions at issue.

## II. ARGUMENT

### A. Fuse Chicken Fails to Establish That the Bass Model Is a Reliable Methodology for Calculating Lost Sales.

Fuse Chicken agrees with Amazon that Mr. Haas purported to employ the Bass Model "to forecast the future sale of Fuse Chicken's products."  Opp. 3; Dkt. 142 ("Mot.") 5.  But

nowhere in Mr. Haas's report, Mr. Haas's deposition testimony, or Fuse Chicken's Opposition is there any support for such application. As explained in Amazon's Motion, Fuse Chicken cannot carry its burden to show that the Bass Model is a reliable methodology for Mr. Haas's intended purpose: to forecast purported "but for" sales across all products for a single company, and use those projected sales to determine the company's alleged lost sales and profits. *See* Mot. 7-10.

In an attempt to downplay the central importance of this unprecedented application of the Bass Model to Mr. Haas's expert opinions, Fuse Chicken claims that Amazon mistakenly characterizes Mr. Haas's use of the Bass Model as the calculation of "lost sales or . . . damages," when in fact he used it to "predict" but-for sales. Opp. 6-7. That is wrong: Amazon's Motion faulted Mr. Haas for using the Bass Model "to project what a single company's future sales of all of its various products, in the aggregate, would have been, absent alleged infringement." Mot. 5. In any event, Fuse Chicken's argument makes a distinction without a difference: Mr. Haas's use of the Bass Model to project but-for sales is inextricably intertwined with his subsequent calculation of lost sales and profits. The but-for sales yielded by Mr. Haas's use of the Bass Model may be ▮▮▮▮▮▮▮▮▮ of his damages calculation, but without it there can be no calculation of those sales that were allegedly "lost." Opp. 7. Indeed, the subsequent "calculation" is a simple matter of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *See* Dkt. 97 (Haas Exp. Rpt.) ¶ 86 ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮). After exclusion of Mr. Haas's unreliable opinions regarding his application of the Bass Model to calculate but-for sales, his derivative calculations of lost sales and lost profits that necessarily depend on those predicate but-for sales cannot stand.

Fuse Chicken admits that the Bass Model was developed to measure "product diffusion," Opp. 5, yet persistently conflates this concept with the projection of an individual company's sales, across all of its products (what Mr. Haas purports to calculate). "Product diffusion" refers

3

to the rate of adoption of new product categories by consumer populations—*e.g.*, the rate of adoption of color televisions (*as a class*) among American households in the 1960s. *See* Mot. 8; Opp. 5 (admitting that "[p]roduct diffusion is the process by which an innovation is communicated through a group of people, such as consumers."). Mr. Haas does not offer any opinions about the rate at which a new product category is being adopted within a consumer segment. Rather, Mr. Haas purports to use the Bass Model to project the aggregate sales of all products that a single company (Fuse Chicken) makes. *See* Dkt. 97 (Haas Exp. Rpt.) ¶¶ 74-89.

Fuse Chicken ignores this disconnect and instead engages in an extensive discussion of the validity of the Bass Model in the abstract and its use for *other* applications. Fuse Chicken's assertion that "thousands of peer reviewed papers have been published using" the Bass Model is irrelevant. Opp. 9. Mr. Haas's report did not cite to a single one of the articles Fuse Chicken attaches as exhibits to the Opposition. *See* Amazon's Motion to Strike ("Mot. to Strike"). Nor does a single one of those articles describe the application of the Bass Model to project future sales of a company, across all of that company's various products. *See* Opp. 6 (citing article describing use of Bass Model to chart "diffusion" of "a newly introduced prescription drug"); Dkts. 179-2 – 179-12, 179-19 (Rand Decl. Exs. 1-11, 18).

Fuse Chicken tacitly concedes that the Bass Model lacks "general acceptance" as a means for calculating a company's total alleged lost sales across all of its products, contending that this fundamental shortcoming does not require exclusion of Mr. Haas's opinions. Opp. 7-8. The Supreme Court has made clear, however, that "a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993) (internal citations and quotation marks omitted). Similarly, and notwithstanding Fuse Chicken's claim otherwise, Opp. 5, it is well-settled in the Sixth Circuit that whether a methodology has "enjoyed general acceptance" is a key factor for a court to consider when assessing its reliability. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006). Nor has Fuse Chicken carried its burden to

4

demonstrate that any *other* factors relevant to the *Daubert* analysis are satisfied here.[1] For example, Fuse Chicken identifies no evidence that Mr. Haas's unprecedented application of the Bass Model has "ever been tested, subjected to peer review, [or] possesses a known or potential rate of error." *Id.*

*United States v. Coleman*, 202 F. Supp. 2d 962 (E.D. Mo. 2002), cited by Fuse Chicken, is not to the contrary. Opp. 8. In that case, the evidentiary record contained plentiful scientific literature indicating that the expert methodology at issue—mitochondrial DNA analysis—had "a proven track record of utility and reliability" for the purpose for which it was used by the challenged expert: to conduct forensic human identity testing. *Coleman*, 202 F. Supp. 2d at 969. Here, although the Bass Model has been in existence for 50 years, Fuse Chicken is unable to identify *any* literature or other evidence that the methodology has any track record, let alone "a proven track record of utility and reliability," for projecting a company's aggregate sales of all of its different products, as Mr. Haas purports to do here. *Id.*

### B. Fuse Chicken Fails to Establish That Mr. Haas Is Qualified to Opine on the Application of the Bass Model to Calculate Lost Sales.

Fuse Chicken touts Mr. Haas's experience as "a thirty plus year intellectual property valuation veteran." Opp. 3.[2] But Mr. Haas does not purport to value any intellectual property in this case, and his general experience applying *other* methodologies to calculate damages in *other* cases does not bestow on him the required "skills, education, or experience" to opine on the application and implementation of the Bass Model—a methodology he had never even heard of prior to this case, and about which he has no specialized knowledge—to calculate Fuse Chicken's damages. *Huffman v. Electrolux Home Prods., Inc.*, 129 F. Supp. 3d 529, 540 (N.D.

---

[1] Fuse Chicken's conclusory and unsupported contention that Mr. Haas's use of the Bass Model "is generally accepted," Opp. 7, should be disregarded.

[2] Fuse Chicken also contends that Mr. Haas "has been qualified to provide expert opinions on damages in '███████████████' cases." Opp. 9. That is irrelevant and wrong: Mr. Haas testified that he has "████████" that many cases as an expert, not that he survived *Daubert* scrutiny or offered expert opinions in all of those cases. Dkt. 179-13 (Haas Dep. Tr.) 31:22-32:5.

Ohio 2015); *see* Mot. 10-13. Fuse Chicken's failure to carry its burden to show that Mr. Haas possesses "expertise . . . particular to the science involved in the case" requires exclusion of Mr. Haas's opinions relating to the Bass Model. *Huffman*, 129 F. Supp. 3d at 537.

### 1. Fuse Chicken concedes Mr. Haas had no knowledge of the Bass Model prior to August 2018.

Fuse Chicken does not dispute that Mr. Haas had not heard of the Bass Model before August 2018, when Fuse Chicken's marketing expert, Dr. Margaret Campbell, mentioned it to him on a phone call. Opp. 4; *see* Dkt. 142-2 (Haas Dep. Tr.) 30:6-18 ("I had not personally been aware of [the Bass Model] prior to the discussions I had with Dr. Campbell."). Though Fuse Chicken contends that Mr. Haas subsequently ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Opp. 9, that so-called ▓▓▓▓▓▓ consisted of nothing more than ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Dkt. 142-2 (Haas Dep. Tr.) 111:15-112:13. This cursory review of the Bass Model is not "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓," and did not provide Mr. Haas with anything approaching "specialized knowledge."

### 2. Fuse Chicken fails to show that Mr. Haas has specialized knowledge regarding the construction or implementation of the Bass Model.

Mr. Haas does not have mere "gaps" in his knowledge regarding the Bass Model. Opp. 11. He lacks *any* expertise regarding the Bass Model's applications and theoretical bases, and so cannot offer an expert opinion on that subject. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (cited at Opp. 11) ("Rule 702 does require that the area of the witness's competence matches the subject matter of the witness's testimony.") (internal citations and quotation marks omitted).

Fuse Chicken resorts to arguing that Amazon has not shown that any specialized knowledge is required to construct and implement the Bass Model. Opp. 11. Fuse Chicken has it backwards. The burden is on *Fuse Chicken* to establish whether or not specialized knowledge is required to apply the Bass Model. And Mr. Haas's own actions demonstrate that specialized

knowledge *is* required, and that he did not have it: Mr. Haas was unable to construct and run the Bass Model on his own, and needed to rely on the specialized knowledge of *others* to do so.

At the recommendation of Fuse Chicken's counsel, Mr. Haas consulted with Professor Lan Luo—whom he had never heard of or spoken with previously—regarding the construction and implementation of the Bass Model. Dkt. 142-2 (Haas Dep. Tr.) 24:20-26:2; Mot. 11. Specifically, at Professor Luo's recommendation, Mr. Haas ▮▮▮▮▮ ▮▮▮▮▮ Dkt. 142-2 (Haas Dep. Tr.) 133:3-135:21. At his deposition, Mr. Haas admitted that ▮▮▮▮▮ ▮▮▮▮▮ *Id.* 173:22-24. He simply ▮▮▮▮▮ *Id.* 133:3-135:21.[3] Nor did Mr. Haas have a view as to whether ▮▮▮▮▮ *Id.* 134:6-12.[4]

### 3. Fuse Chicken cannot demonstrate Mr. Haas's specialized knowledge merely by insisting he has it.

Fuse Chicken asserts that Mr. Haas "determined how the Bass Model's variables should be set." Opp. 3; *see id.* 12 ("Haas determined how each of the independent variables should be set."); *id.* 13 ("Haas himself assigned the inputs for the Bass Model."). These assertions are demonstrably incorrect. As Amazon explained in the Motion, Mr. Haas did not personally

---

[3] The Opposition belatedly attempts to pad the record with information about DecisionPro that Mr. Haas did not consider and about which there is no evidence he has any knowledge. Opp. 12; *see* Mot. to Strike.

[4] Fuse Chicken argues in its Opposition that Amazon had the opportunity to test "Haas's use of the Bass Model." Opp. 16-17. This misses the point: it is Professor Luo's purported expertise and qualifications—on which Mr. Haas's calculations rely—that Amazon was given no opportunity to test. Mot. 13.

determine *any* of the values used for the four Bass Model input variables (A, M, p, q)—nor does he possess the expertise to do so. Mot. 12-13. The values Mr. Haas used for the A variable (actual sales) simply comprise Fuse Chicken's historical sales data, which was provided to Mr. Haas by Fuse Chicken. The values Mr. Haas used for the p and q variables were generated by the DecisionPro software, and Mr. Haas admits that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dkt. 142-2 (Haas Dep. Tr.) 173:16-176:21. Mr. Haas further admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* 176:22-178:5.[5] Finally, to determine the M variable (potential market size), Mr. Haas relied blindly on unsubstantiated and untested sales estimates invented by Fuse Chicken management for purposes of this litigation. Dkt. 97 (Haas Exp. Rpt.) ¶¶ 79-82; *infra* 10-14.

Fuse Chicken does not identify any evidence to support its conclusory statements that Mr. Haas independently determined any of the four variables on which the Bass Model relies. It is thus beyond dispute that, as stated in Amazon's Motion, Mr. Haas did nothing more than plug inputs provided by others into an off-the-shelf software package he does not understand, to implement a model he had not heard of until this assignment. Mot. 12. Because Mr. Haas did not—and could not—rely "on his own skills, education, or experience" to construct and implement the Bass Model, his opinions should be excluded. *Huffman*, 129 F. Supp. 3d at 540.

      **4.**    **Mr. Haas's general experience with "regression analyses" does not satisfy the requirement that he possess specialized knowledge regarding implementation and use of the Bass Model.**

Mr. Haas's admitted lack of expertise regarding the Bass Model is not excused by virtue of his general experience with "regression analyses." Opp. 4. Fuse Chicken cannot save Mr. Haas's opinions with the fallacious transitive reasoning that, because: (1) the Bass Model is purportedly a type of regression analysis; and (2) Mr. Haas has used *other* types of regression

---

[5] Mr. Haas's contradictory assertion in his supporting declaration to the Opposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is sham testimony that should not be credited. Dkt. 179-21 ¶ 9; *see* Mot. to Strike.

analyses in other cases; *ergo*, (3) Mr. Haas innately possesses all of the necessary knowledge to construct and implement the Bass Model. *Id.* 13. An auto mechanic with 30 years of experience repairing traditional, internal-combustion-powered Ford sedans is not thereby also an expert in the specialized and distinct repair of Tesla electric vehicles. *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417, at *2 (N.D. Ohio July 1, 2010) (granting motion to exclude opinions about alleged forklift defect by mechanical engineer with no specific experience with forklifts); *Huffman*, 129 F. Supp. 3d at 537 ("Expertise in the technology of fruit is not sufficient when analyzing the science of apples[.]").[6]

The cases cited by Fuse Chicken do not change the analysis. *See* Opp. 10-11. None of those cases address circumstances in which an expert with *zero* knowledge or experience about the construction, implementation, or theoretical underpinnings of a given methodology, like Mr. Haas, purports to offer an opinion about the application of that methodology. For example, the court in *Pineda v. Ford Motor Co.* determined that an expert with "unassailable" expertise in "the failure of glass" could testify that written instructions regarding the replacement of glass auto parts would help avoid negative outcomes based on his "expertise in the stresses and other forces that might cause a material such as glass to fail." 520 F.3d 237, 245 (3d Cir. 2008). The court in *Laski v. Bellwood* likewise held that expert treating physicians could reliably offer opinions that the plaintiff's condition resulted from a car accident because those opinions were within the purview of the experts' specialized training to "recognize catalysts of physical discomfort and injury in order to treat patients properly." 1997 WL 764416, at *3 (6th Cir. Nov. 26, 1997). Here, by contrast, Mr. Haas has no knowledge or training relating to the Bass Model opinions that Amazon seeks to exclude.

---

[6] Fuse Chicken's observation that Amazon's expert Greg Regan has used "regression models" to calculate damages in other cases is even less relevant. Opp. 10. Mr. Regan's experience has nothing to do with whether Mr. Haas has any specialized knowledge about the Bass Model.

Similarly unavailing is Fuse Chicken's attempt to obfuscate the issues and mislead the Court with technical jargon.  Fuse Chicken illogically suggests that the ▮▮▮▮▮▮▮▮ "R-squared" values of Mr. Haas's Bass Model curves obviate the need for Fuse Chicken to show that Mr. Haas possesses specialized knowledge of that model.  Opp. 13.  This makes no sense.  As Fuse Chicken concedes, "R squared is a measure of how closely the data" (here, Fuse Chicken's *actual* sales data) "is fitted to the line of regression" (here, Mr. Haas's Bass Model curve).  *Id.*  It is no surprise that the Bass Model ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 142-2 (Haas Dep. Tr.) 173:16-21.  The R squared value is not at all suggestive of the accuracy of the *projected sales* Mr. Haas calculates using the Bass Model.

### C. Fuse Chicken Fails to Establish that Mr. Haas's Bass Model Analysis Has a Reliable Factual Basis.

As explained in Amazon's Motion, Mr. Haas's calculation of Fuse Chicken's purported but-for sales using the Bass Model depends on the value used for the M variable—which, per Mr. Haas, corresponds to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. 14; *see* Dkt. 97 (Haas Exp. Rpt.) ¶ 75.  To determine the value of the M variable, Mr. Haas relied on Fuse Chicken management's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 79 & Ex. 8.1. Fuse Chicken's CEO and its Head of Sales provided these numbers to Mr. Haas nine days before his expert report was due, and Mr. Haas did nothing to independently analyze or test those assumptions—despite contradictory evidence in the record regarding the reliability of those estimates.  Mot. 14-17.  Fuse Chicken offers no authority permitting expert testimony on the basis of such unreliable facts.

**1. Mr. Haas did not independently analyze the reliability of Fuse Chicken management's peak monthly sales estimate.**

Fuse Chicken repeatedly—and without support—asserts that Mr. Haas "tested," "analyzed[,] and evaluated" the self-serving sales estimates provided by Fuse Chicken management. *See* Opp. 3, 13-14. That is demonstrably wrong.

*First*, Fuse Chicken claims that Mr. Haas determined that the Fuse Chicken sales estimate ███████████████████████████████████████████████████████ *Id.* 14. For this, Fuse Chicken cites to paragraph 79 of Mr. Haas's report, in which he states that Fuse Chicken management's aspirational estimate is ███████████████████████ ███████████████████████████████ Dkt. 97 (Haas Exp. Rpt.) ¶ 79. But the only basis Mr. Haas identifies for his belief that ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████. *Id.* ¶ 79 & n.115. Mr. Haas did not undertake *any* independent analysis to test the plausibility of this pronouncement, and admitted that he had ████████ ████████████████████████████████████████████████████████████████████ *See* Dkt. 179-13 (Haas Dep. Tr.) 204:23-25, 206:1-17. Given the lack of any evidence that Fuse Chicken's CEO's litigation-driven "estimate" was reasonable, Mr. Haas may not rely on it. *See Otis v. Doctor's Assocs., Inc.*, 1998 WL 673595, at *6 (N.D. Ill. Sept. 14, 1998) (excluding expert opinion regarding lost profits calculations when there was no evidence "that establishing the target numbers of 89 or 121 Cajun Joe's franchises in Chicago was a reasonable goal that could be achieved in the time period provided").

*Second*, Fuse Chicken claims Mr. Haas conducted a "████████████████████ ████████████████████████████████████. Opp. 14 & n.11. But this "██████" is also based entirely on litigation-driven assertions from Fuse Chicken management. ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████" Dkt. 97 (Haas Exp. Rpt.) ¶ 81. Fuse Chicken does not dispute that Mr. Haas's *only basis* for positing those numbers is that they "████████

11



▆▆▆▆▆▆▆▆▆▆▆▆▆. *Id.*

*Third*, Fuse Chicken references Mr. Haas's analysis of Fuse Chicken's "▆▆▆▆▆▆ ▆▆▆▆▆" Opp. 14. But that analysis could not have informed Mr. Haas's determination of the M variable or relate at all to any evaluation of Fuse Chicken management's sales estimates, because, as Fuse Chicken admits, that analysis was conducted ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆. *Id*.

*Fourth*, Fuse Chicken states misleadingly that "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆" Opp. 15. Indeed, as described below, the only specific sales projection created before the alleged infringement began predicted just a fraction of the outsized sales calculated by Mr. Haas. *Infra* 12-13. Fuse Chicken does not contest that the peak monthly sales estimates on which Mr. Haas relied were concocted by management for purposes of this litigation.

In short, Mr. Haas's Bass Model opinions derive from "the mere say-so of two [Fuse Chicken] executives." *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 826-27 (S.D. Ind. 2012) (excluding damages expert opinion based on executives' "conclusory assertions" that expert "accepted . . . at face value without knowing whether they have any evidentiary support"). That self-serving and litigation-driven "say-so" cannot form the basis of a reliable expert opinion.

### 2. Mr. Haas ignored Fuse Chicken's actual course-of-business sales estimates and other contradictory evidence.

Fuse Chicken does not explain Mr. Haas's failure to reconcile his hyperbolic Bass Model projections with contradictory evidence in the record.

*First*, Fuse Chicken does not dispute that, in late 2016, its CFO Chris Fawcett projected total sales revenue of only ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *See* Dkt. 97 (Haas Exp. Rpt.) Ex. 4.1; Mot. 15. Fuse Chicken concedes that Mr. Haas did not evaluate Fuse Chicken

management's litigation-driven sales estimates against Chris Fawcett's contemporaneous projections, and instead attempts to downplay Chris Fawcett's role at the company. Opp. 15. The evidence speaks for itself: ███████████████████████████████████ ███, Barnhart Reply Decl. Ex. A (C. Fawcett Dep. Tr.) 223:6-11, and testified that Chris Fawcett is the employee "who I run strategy ideas by, usually first before the other company owners," *id.* Ex. B (J. Fawcett Dep. Tr.) 155:3-16.[7] In any event, ███████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████. *Id.* Ex. A (C. Fawcett Dep. Tr.) 59:20-60:12.

*Second*, Fuse Chicken does not dispute that its Head of Sales, James Siegl, testified—less than three months before providing Mr. Haas with Fuse Chicken's unsupported sales estimates—that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████." Dkt. 142-7 (Siegl Dep. Tr.) 248:6-16. Fuse Chicken responds that ████████████████████ ██████████████████████████████████████████████████ ███████████████████████████" Opp. 15. That position makes no sense. It cannot be that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* Dkt. 97 (Haas Exp. Rpt) ¶ 86.

The reasons proffered by Mr. Haas for his "discount[ing]" of Mr. Siegl's testimony are similarly illogical. Opp. 15. Mr. Haas testified that ██████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ Dkt. 179-13 (Haas Dep. Tr.) 153:11-154:1. So although Mr. Haas discounted Mr. Siegl's unfavorable testimony

---

[7] "Barnhart Reply Decl." refers to the Declaration of Lindsey Barnhart in Support of Amazon.com, Inc.'s Reply Memorandum of Points and Authorities in Support of Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas.

regarding lost sales ███████████████████████████████████, Mr. Haas *relied entirely* on the peak monthly sales estimate provided by Mr. Siegl in calculating Fuse Chicken's alleged lost profits.

*Finally*, Fuse Chicken's observation in a footnote, that Mr. Siegl "█████████████████████████████████████████████████████████████", is irrelevant to the larger point that Mr. Haas did nothing to test Fuse Chicken management's self-serving and litigation-driven sales estimates. Opp. 15 n.13. Fuse Chicken's characterization of Mr. Siegl's testimony is also demonstrably wrong: when asked "█████████████████████████████████████████████████████████████████████████████████████████████████████████. Dkt. 179-18 (Siegl Tr.) 246:3-22; *see also id.* 258:13-18 ████████████████████████████████████████████████████████████████████████████████████████.

### 3. Amazon's Motion challenges the *reliability* of Mr. Haas's opinions.

Fuse Chicken mischaracterizes Amazon's arguments as mere "questions about the accuracy of [Mr. Haas's] estimate." Opp. 14. Not so. Amazon challenges the *reliability* of the bases underlying Mr. Haas's opinion: Mr. Haas's "blind adherence to data absent any sort of independent investigation stops short of the type of reliability contemplated by *Daubert*[.]" *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015). In a footnote, Fuse Chicken asserts that the cases Amazon cites confirming this principle are "easily distinguished," yet fails to explain how its recitation of the facts of those cases creates a material legal distinction. Opp. 16 n.14. Immaterial factual distinctions aside, each of Amazon's cases confirms that sales projection assumptions that consist of nothing "more than aspirational hopes" of company management, as Mr. Haas's assumptions do here, are not reliable factual bases for an expert opinion. *Otis*, 1998 WL 673595, at *5-6 (excluding expert opinion); *see* Mot. 17 (citing cases). The only two cases cited by Fuse Chicken in support of its arguments are inapposite, as they do not address arguments that an expert's underlying assumptions are *unreliable*, but only that the

expert's *conclusions* are "simply incorrect." *Lee v. Horton*, 2018 WL 5729049, at *2 (W.D. Tenn. Octo. 2, 2018); *see also In re High Pressure Laminates Antitrust Litig.*, 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) (addressing argument that expert arrived at the wrong conclusion).

### D. Fuse Chicken Agrees That Mr. Haas's Damages Opinion Is Inextricably Tied to Dr. Ghose's Causation Opinion.

Fuse Chicken does not contest that the nearly ▮▮▮▮▮▮ in alleged lost profits Mr. Haas calculated using the Bass Model depends entirely on Fuse Chicken's expert Dr. Ghose's damages causation opinions—including Dr. Ghose's unreliable opinion that Fuse Chicken lost *international* sales due to negative reviews on Amazon.com, the *United States* marketplace. Opp. 17 n.15. Nor does Fuse Chicken contest that Mr. Haas's actual damages calculations uniformly assume *global* lost profits. *Id.* In other words, Mr. Haas does not provide any opinion or calculation of what lost profits would be if they were limited to the United States, or even North America, alone. Dkt. 142-2 (Haas Dep. Tr.) 75:21-76:9 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). Accordingly, there is no dispute that if the Court excludes Dr. Ghose's opinions related to damages causation with respect to *international* sales, Mr. Haas's damages calculations must also be excluded since they necessarily assume that such causation can be proved, and provide no means of determining U.S.-only damages. Mot. 17-18.

### III. CONCLUSION

Amazon respectfully requests that the Court (1) preclude Mr. Haas from presenting any opinion regarding the Bass Model, including any calculations of purported but-for sale, lost sales, or lost profits determined using the Bass Model, at trial or at any other stage of these proceedings; and (2) strike paragraphs 21, 68-69, 73-89, 98-99, and 104, and exhibits 3-7, of Mr. Haas's report. In addition, should the Court grant Amazon's motion to exclude Dr. Ghose's opinion regarding international reliance on Amazon.com reviews, Dkt. 125-1, Amazon respectfully requests that the Court strike paragraphs 63-66 and 106 of Mr. Haas's report, which rely on and assume Dr. Ghose's opinion to be true.

DATED: April 1, 2019  */s/ Clara J. Shin*

Clara J. Shin (admitted *pro hac vice*)
Nathan E. Shafroth (admitted *pro hac vice*)
Lindsey Barnhart (admitted *pro hac vice*)
David S. Watnick (admitted *pro hac vice*)
COVINGTON & BURLING, LLP

Roger M. Synenberg (#32517)
Clare C. Moran (#81134)
SYNENBERG, COLETTA & MORAN, LLC

*Attorneys for Defendant Amazon.com, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, a copy of the foregoing Amazon.com, Inc.'s Reply Memorandum of Points and Authorities in Support of Motion to Exclude Certain Opinions of Plaintiff's Expert David Haas, and accompanying declaration and exhibits, was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Clara J. Shin